## UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## EASTERN DIVISION

| | | |
|---|---|---|
| T.S., a minor, by and through his parents and legal guardians, TROY STEPHENSON and MISTY STEPHENSON, | } } } } } | |
| Plaintiff, | } } | |
| v. | } } | Case No.: 1:17-cv-1876-ACA |
| TALLADEGA COUNTY BOARD OF EDUCATION, et al., | } } } | |
| Defendants. | } | |

## MEMORANDUM OPINION AND ORDER

Plaintiff T.S., a Childersburg Middle School student, wrote President Donald Trump's name on Defendant Anita Foy's classroom whiteboard two days after the 2016 presidential election. Ms. Foy issued a disciplinary referral to T.S. for violating a school rule limiting discussion of the election to history class. The school's assistant principal, Defendant Michael Bynum, punished T.S. by paddling him.

T.S., by and through his parents and legal guardians, filed this lawsuit alleging that Ms. Foy, Mr. Bynum, and Defendant Talladega County Board of Education (the "Board") violated his constitutional rights. The following claims remain pending: (1) T.S.'s § 1983 free speech claim against the Board, and Ms. Foy

and Mr. Bynum in their individual capacities (Count One); (2) T.S.'s § 1983 due process claim against the Board and Mr. Bynum in his individual capacity (Count Two); and (3) state law assault, battery, and intentional infliction of emotional distress claims against Mr. Bynum in his individual capacity (Counts Three and Four).[1]

Before the court are Defendants' motions for summary judgment. (Docs. 36, 37). Because Ms. Foy and Mr. Bynum did not violate T.S.'s constitutional rights, Ms. Foy and Mr. Bynum are entitled to qualified immunity on T.S.'s § 1983 claims against them, and the Board is entitled to judgment as a matter of law. Therefore, the court **WILL GRANT** the motions for summary judgment with respect to T.S.'s § 1983 claims. In the absence of an independent basis for jurisdiction over T.S.'s state law claims against Mr. Bynum, the court will decline to exercise supplemental jurisdiction over the claims.

## I.     BACKGROUND

In deciding a motion for summary judgment, the court "draw[s] all inferences and review[s] all evidence in the light most favorable to the non-moving party."

_____

[1] T.S. originally filed suit against the Board, Childersburg Middle School, Dr. Suzanne Lacey, Jenna Jones, Mr. Bynum, and Ms. Foy. (Doc. 1). The court dismissed T.S.'s state law claims against the Board, all claims against Childersburg Middle School, and all official capacity claims and all claims for injunctive and declaratory relief against the individual defendants. (Doc. 23). T.S. filed an amended complaint. (Doc. 24). The court then dismissed all claims against Dr. Lacey and Ms. Jones and T.S.'s § 1983 due process and state law claims against Ms. Foy. (Doc. 25; Doc. 33).

*Hamilton v. Southland Christian Sch., Inc.*, 680 F.3d 1316, 1318 (11th Cir. 2012) (quotation marks omitted).

The events giving rise to this lawsuit took place at Childersburg Middle School in the days before and after the 2016 presidential election. (Doc. 38-1 at 20). In the weeks leading up to the election, Assistant Principal Michael Bynum[2] "heard reports of disruptions and unrest in other schools around the area in regards to the election." (Doc. 38-5 at 51). The day after the election, Mr. Bynum received a report that students at Childersburg Middle School were "wound up about the election and were very loud and rowdy in the halls," (doc. 38-7 at 3; *see also* doc. 38-5 at 40, 51), causing "disruption in the hall regarding the election results" (doc. 38-5 at 42). Mr. Bynum testified that "[i]n an effort to make sure that the school was not disrupted," he asked a school staff member to make "a general announcement . . . that all discussions of the election take place in only the history classroom so as not to disrupt other classes or the hallways." (Doc. 38-5 at 40; *see also* Doc. 38-11 at 2).

Consistent with Mr. Bynum's instruction, the staff member "made an announcement over the school's public address system that discussions of the presidential election were to be limited to history class in order to avoid disruptions

---

[2] Although he was the Assistant Principal, Mr. Bynum was serving as the acting Principal because the Principal was on extended leave. (Doc. 38-5 at 41; Doc. 38-7 at 2).

in classes or in the hallways and that disruptions would be treated as disciplinary infractions." (Doc. 38-11 at 2–3; *see also* Doc. 38-12 at 3). T.S., then in 8th grade, was at school when the announcement was made, but he does not remember hearing the announcement. (Doc. 38-1 at 37; Doc. 38-3 at 27; Doc. 38-5 at 23).

At Childersburg Middle School, students are expected to report directly to their homeroom when they arrive at school. (Doc. 38-5 at 61; Doc. 38-12 at 3). A student's first period class also serves as his homeroom. (Doc. 38-12 at 3). During the homeroom period, teachers take attendance and make announcements, and students work on academic assignments. (Doc. 38-7 at 4; Doc. 38-8 at 3). T.S.'s assigned homeroom and first period was in Dottie Montgomery's history class. (Doc. 38-1 at 23–24; Doc. 38-12 at 2).

Two days after the election, instead of reporting to his assigned homeroom period in Ms. Montgomery's classroom, T.S. went directly to Ms. Foy's classroom without Ms. Foy's or Ms. Montgomery's permission. (Doc. 38-7 at 3; Doc. 38-12 at 3). Upon entering, T.S. wrote "Trump 2016" on Ms. Foy's whiteboard. (Doc. 38-1 at 28–30; Doc. 38-8 at 2–3). T.S. testified that he "heard a lot of arguing," and "a handful" of the 15 students in Ms. Foy's class were "upset" about what he wrote on the board. (Doc. 38-1 at 33–34). When other students complained, T.S. "argued a bit" with them and "rub[bed] it in their face [that President Trump won]." (Doc. 38-1 at 34–35).

T.S. left Ms. Foy's classroom and went to the restroom. (Doc. 38-1 at 42). When he left the restroom, Ms. Foy approached him in the hallway and told T.S. that he should not have written "Trump 2016" on her whiteboard because "it started a lot of fights and argument." (Doc. 38-1 at 43–44). Ms. Foy did not say anything else about the presidential candidates during this discussion with T.S. (Doc. 38-1 at 44–45).

Ms. Foy walked T.S. back to Ms. Montgomery's classroom and told Ms. Montgomery what happened. (Doc. 38-1 at 45). Ms. Foy then issued a discipline referral to T.S. (Doc. 38-1 at 45). The discipline referral form states:

> Students were told on yesterday because of the sensitivity of the matter, not to discuss the election unless it was in History class. They were told any discussion would result in an office referral. T. decided to write "Trump" on my board this morning, disregarding others that were in the classroom. This resulted in some upset students. I informed student that the name (it could have been the name of the other candidate) wasn't the issue. But it was the nature of everything behind it.

(Doc. 38-2 at 2).

Ms. Foy sent T.S. to the school office, and T.S. met with Mr. Bynum. (Doc. 38-1 at 47–49). Mr. Bynum told T.S. he was written up for causing a commotion in Ms. Foy's classroom. (Doc. 38-1 at 50, 53; Doc. 38-5 at 24–25, 52). Mr. Bynum did not say anything about the presidential candidates themselves. (Doc. 38-1 at 50–51).

Mr. Bynum called T.S.'s father and explained what T.S. had done and that as punishment, Mr. Bynum planned to paddle T.S. or give him in-school suspension. (Doc. 38-3 at 34–35; Doc. 38-5 at 25–26). T.S.'s father told Mr. Bynum that he did not believe that T.S. should be punished for what happened, but that if Mr. Bynum needed to take action right away, then T.S. could decide which punishment he wanted to receive. (Doc. 38-3 at 36–38; Doc. 38-5 at 27, 54). T.S. chose the paddling because he "felt like it'd be easier just to get it done with." (Doc. 38-1 at 56–57).

Mr. Bynum gave T.S. two licks with the paddle. (Doc. 38-1 at 61, 65). T.S. testified that the first lick hurt "[a] good bit," but he didn't say anything to Mr. Bynum between the first and second lick. (Doc. 38-1 at 65). T.S. did not cry during the paddling, and when asked during his deposition how hard the licks were, T.S. testified that "it wasn't too bad." (Doc. 38-1 at 69, 73–74).

By the time Mr. Bynum dismissed T.S. from the office, first period had ended. (Doc. 38-1 at 66). T.S. reported to his second period class in Ms. Foy's classroom. (Doc. 38-1 at 66; Doc. 38-8 at 4). On his own initiative, T.S. apologized to Ms. Foy for his behavior. (Doc. 38-1 at 67; Doc. 38-8 at 8). According to Ms. Foy, when T.S. returned to class, he did not appear to be in any discomfort and his demeanor and interaction with other students were normal. (Doc. 38-8 at 4). Shortly after Ms.

Foy's class began, T.S. was called to the office because his mother had come to the school to check him out for the day. (Doc. 38-1 at 68; Doc. 38-4 at 24–25).

T.S. was not in pain when he left school. (Doc. 38-1 at 69). He did not have bruises, and he could walk normally. (Doc. 38-1 at 69–70; Doc. 38-3 at 39–40). T.S. did not need medical treatment or counseling. (Doc. 38-1 at 76, 84; Doc. 38-3 at 60).

T.S. returned to school the next school day. (Doc. 38-1 at 76; Doc. 38-3 at 61). He finished the school year at Childersburg Middle School and did not have any further problems with Mr. Bynum or Ms. Foy. (Doc. 38-1 at 76–80).

## II.    ANALYSIS

In deciding a motion for summary judgment, the court must first determine if the parties genuinely dispute any material facts, and if they do not, whether the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). A disputed fact is material if the fact "might affect the outcome of the suit under the governing law," and a dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

Ms. Foy and Mr. Bynum assert the defense of qualified immunity as to T.S.'s § 1983 claims. The Board argues that it is entitled to summary judgment because T.S. cannot establish that the Board violated his constitutional rights. Because T.S.'s

constitutional claims against the Board are dependent upon his constitutional claims against the individual defendants, the court first addresses T.S.'s § 1983 claims against the individual defendants.

### 1. § 1983 Claims Against the Individual Defendants

T.S. asserts § 1983 claims against Ms. Foy and Mr. Bynum for violations of his First Amendment right to freedom of expression. T.S. also asserts a § 1983 claim against Mr. Bynum for a violation of his Fourteenth Amendment substantive due process rights.[3] Ms. Foy and Mr. Bynum seek summary judgment on the basis that they are entitled to qualified immunity from those claims.

"Qualified immunity protects government officials performing discretionary functions from suits in their individual capacities unless their conduct violates clearly established statutory or constitutional rights of which a reasonable person would have known." *Shaw v. City of Selma*, 884 F.3d 1093, 1098 (11th Cir. 2018). T.S. concedes that Ms. Foy and Mr. Bynum were performing discretionary functions. (Doc. 42 at 12; Doc. 50 at 13). Therefore, T.S. bears the burden of showing that the individual defendants' conduct violated a constitutional right and that the right was clearly established at the time of the conduct. *Lee v. Ferraro*, 284 F.3d 1188, 1194 (11th Cir. 2002). The court may consider in any order whether T.S.

---

[3] Although the amended complaint is ambiguous, T.S. has clarified that he asserts a substantive due process claim only and not a procedural due process claim. (Doc. 46).

has satisfied his burden. *Alcocer v. Mills*, 906 F.3d 944, 951 (11th Cir. 2018). As explained below, T.S. has not established that Ms. Foy and Mr. Bynum violated his free speech or due process rights.

i.     *§ 1983 First Amendment—Free Speech*

In Count One of his amended complaint, T.S. claims that Ms. Foy and Mr. Bynum violated his First Amendment right to freedom of expression by limiting discussion of the presidential election to history class and by punishing him for violating the rule when he wrote "Trump 2016" on Ms. Foy's classroom whiteboard. (Doc. 24 at 4–6). In essence, he asserts two separate free speech claims: one based on the existence of the policy restricting speech about the election to history class, and one based on his punishment for violating the policy.

Students do not "shed their constitutional rights to freedom of speech or expression at the schoolhouse gate." *Tinker v. Des Moines Indep. Cmty. Sch. Dist.*, 393 U.S. 503, 506 (1969); *Holloman ex rel. Holloman v. Harland*, 370 F.3d 1252, 1264 (11th Cir. 2004) (First Amendment rights "unquestionably exist in public schools."). However, "the constitutional rights of students in public school are not automatically coextensive with the rights of adults in other settings," and those rights "must be applied in light of the special characteristics of the school environment." *Morse v. Frederick*, 551 U.S. 393, 396–97 (2007) (quotation marks and citations omitted).

Whether, and under what circumstances, school officials may restrict student speech depends on the nature of the expression. The Supreme Court has recognized at least three categories of student speech: (1) pure student expression under *Tinker*, 393 U.S. at 508; (2) vulgar, lewd, offensive, or indecent speech under *Bethel School District No. 403 v. Fraser*, 478 U.S. 675, 685 (1986); and (3) school-sponsored expression under *Hazelwood School District v. Kuhlmeier*, 484 U.S. 260, 273 (1988). *See Bannon v. School Dist. of Palm Beach Cty.*, 387 F.3d 1208, 1213–14 (11th Cir. 2004). T.S.'s speech in this case is pure student expression; the court categorically rejects any implication that it could be characterized as vulgar, lewd, offensive, or indecent speech, and it clearly is not school-sponsored expression.

Because this case involves pure student expression, the *Tinker* standard applies. In *Tinker*, the Supreme Court held that school officials may not suppress student expression unless they reasonably conclude that the speech will "materially and substantially disrupt the work and discipline of the school." *Tinker*, 393 U.S. at 513. Applying that test, the Court found that a school district's regulation prohibiting students from wearing black armbands to protest the Vietnam War and suspending students who refused to comply unconstitutionally denied students' free speech rights. *Id.* at 514. The Court noted that the school sought to punish conduct that was a "silent, passive expression of opinion, unaccompanied by any disorder or

disturbance" or "collision with the rights of other students to be secure and to be let alone." *Id.* at 508.

The Court also explained that the prohibition of wearing armbands appeared "to have been based upon an urgent wish to avoid the controversy which might result from" even silent opposition "to this Nation's part in the conflagration in Vietnam" because "school authorities did not purport to prohibit the wearing of all symbols of political or controversial significance" but only those designed to exhibit opposition to the country's involvement in Vietnam. *Tinker*, 393 U.S. at 510. The Court found that "the prohibition of expression of one particular opinion, at least without evidence that it is necessary to avoid material and substantial interference with schoolwork or discipline, is not constitutionally permissible." *Id.* at 511.

The *Tinker* test has its roots in *Burnside v. Byars*, 363 F.2d 744 (5th Cir. 1966), *see Tinker*, 393 U.S. at 509, 513 (citing *Burnside*, 363 F.2d at 749), a decision that is binding on this court. *Bonner v. Pritchard*, 661 F.2d 1206, 1209 (11th Cir. 1981). In *Burnside*, the former Fifth Circuit explained that school officials may not infringe on a student's First Amendment rights "where the exercise of such rights in the school buildings and school rooms do[es] not materially and substantially interfere with the requirements of appropriate discipline in the operation of the school." 363 F.2d at 749. As articulated by the Eleventh Circuit, "[u]nder the *Burnside* standard, student expression may unquestionably be regulated when doing so 'contributes to

the maintenance of order and decorum within the educational system.'" *Holloman*, 370 F.3d at 1271 (quoting *Burnside*, 363 F.2d at 748).

Under *Tinker* and *Burnside*, T.S.'s first free speech claim—that Mr. Bynum's passage of the policy restricting discussion of the election to history class violated his First Amendment rights—fails as a matter law. The undisputed evidence in this case is that Mr. Bynum enacted the policy because in the weeks leading up to the election, Mr. Bynum heard reports of disruptions and unrest at other schools. (Doc. 38-5 at 51). The day after the election, Mr. Bynum received reports that students at Childersburg Middle School were "wound up" about the election results and "very loud and rowdy in the halls." (Doc. 38-7 at 3; *see also* Doc. 38-5 at 42). These reports "might reasonably have led [Mr. Bynum] to forecast substantial disruption of or material interference with school activities. . . ." *Tinker*, 393 U.S. at 514. Therefore, Mr. Bynum's decision to impose a rule limiting election discussion to history class did not violate T.S.'s First Amendment rights.

In addition, imposing the restriction clearly "contribute[d] to the maintenance of order and decorum within the educational system." *Burnside*, 363 F.2d at 748. *Burnside's* rationale compels no other result. In *Burnside*, the former Fifth Circuit found that a regulation prohibiting students from wearing "freedom buttons" in support of civil rights was an unconstitutional infringement on students' freedom of expression. *Id.* at 748–49. Although not the case in *Burnside*, the former Fifth

Circuit recognized that "[i]f the decorum had been so disturbed" by the student expression, then the school principal "would have been acting within his authority and the regulation forbidding the presence of buttons on school grounds would have been reasonable." *Id.* at 748. Here, Mr. Bynum faced reports of actual disruption that the election caused in other schools and at Childersburg Middle School. In response, he barred speech about the election outside of what he, in his function as a school administrator, determined to be an appropriate venue for that speech: history class.

The court also emphasizes that the policy in no way favored one viewpoint over any other. Unlike in *Tinker*, in which students were prohibited from wearing a symbol based specifically on the significance of the message it portrayed, *see Tinker*, 393 U.S. at 510–11, the policy at issue here barred all discussion of the election outside of history class, regardless of the student's position on the election.

The court concludes that, contrary to T.S.'s contention, the mere passage of the policy was not a violation of his First Amendment rights. T.S. also claims that Ms. Foy and Mr. Bynum violated his First Amendment right to free speech by punishing him for violating the policy. The court rejects this claim as well.

T.S. submits that Ms. Foy and Mr. Bynum's punishment is not constitutionally permissible because to justify censorship of student speech, "'there must be a real or substantial threat of disorder, as opposed to the mere possibility of one.'" (Doc. 42

at 6; Doc. 50 at 7) (quoting *Holloman*, 370 F.3d at 1273). T.S.'s argument misses the mark because his speech in fact caused disorder and interfered with work in Ms. Foy's homeroom period.

In the light most favorable to T.S., the undisputed evidence is that without a teacher's permission, he entered a homeroom class during a school period that students were to use for work on academic assignments. (Doc. 38-7 at 3–4; Doc. 38-12 at 3). After he wrote "Trump 2016" on the board, T.S. "heard a lot of arguing." (Doc. 38-1 at 33). A "handful" of students in Ms. Foy's class of 15 students (i.e., one-third of the class) were upset. (Doc. 38-1 at 33). T.S. argued with some students in the class and "rub[bed] it in their face because they didn't want [President Trump] to win." (Doc. 38-1 at 34–35). In addition, after T.S. left Ms. Foy's classroom, her homeroom students "were still arguing and talking loudly about the presidential election and it took [] several minutes to regain control and get the students quieted down." (Doc. 38-8 at 3). Thus, the record demonstrates that T.S.'s conduct "interferre[d] with school activities" and caused a "disturbance[] or disorder[] on the school premises. . . ." *Tinker*, 393 U.S. at 514.

T.S.'s speech is unlike the silent expression in *Tinker* where "[t]here [wa]s no indication that the work of the schools or any class was disrupted." *Id.* at 508. T.S.'s speech and its effect on the classroom also are unlike the expression in *Holloman*, where a student silently raised his fist during the daily recitation of the Pledge of

14

Allegiance.  *Holloman*, 370 F.3d at 1261, 1275 (noting that the student "did not say anything" or "disrupt the class," and his "behavior was not directed 'toward' anyone or any group").

Also notably, unlike *Tinker* and *Holloman*, there is no evidence in this case that Ms. Foy or Mr. Bynum punished T.S. because they disagreed with the views he expressed or were offended by what he wrote on the whiteboard.  *Cf. Tinker*, 393 U.S. at 510–11 (explaining that school officials "singled out for prohibition" a particular viewpoint); *Holloman*, 370 F.3d at 1281 ("The record, interpreted in the light most favorable to Holloman, more than amply supports his argument that he was punished for the substance of his unpatriotic views rather an alleged disruption of class.").

Neither Ms. Foy nor Mr. Bynum mentioned the presidential candidates during discussions with T.S. about his violation of the rule limiting discussion of the election to history class.  (Doc. 38-1 at 44–45, 50–51).  The discipline referral form that Ms. Foy completed on the day of the infraction states that Ms. Foy informed T.S. that "the name (it could have been the name of the other candidate) wasn't the issue" (doc. 38-2 at 2), and Mr. Bynum told T.S. that he was being punished "not because of what [he] wrote or which candidate [he] supported" but because he caused a disruption in Ms. Foy's classroom (doc. 38-7 at 4; *see also* doc. 38-5 at 45, 52).  Importantly, the school rule limiting election talk to a particular class did not

prohibit discussion of any one particular candidate or political position. Thus, the court finds that under the circumstances of this case, Ms. Foy and Mr. Bynum implemented and enforced a "reasonable, non-discriminatory regulation[] as to the time, place and manner of student expression[] . . ." and did not violate T.S.'s right to freedom of speech. *Holloman*, 370 F.3d at 1271 (quotation marks omitted). To hold otherwise would, as Justice Black warned, "usher[] in . . . an entirely new era in which the power to control pupils by the elected officials of state supported public schools in the United States is in ultimate effect transferred to the [judiciary]." *Tinker*, 393 U.S. at 515 (Black, J., dissenting) (quotation marks omitted).

Because Ms. Foy and Mr. Bynum did not violate T.S.'s clearly established First Amendment right to freedom of expression, they are entitled to qualified immunity on T.S.'s § 1983 free speech claim. Accordingly, the court **WILL ENTER** summary judgment in favor of Ms. Foy and Mr. Bynum on this claim.

### ii.    *§ 1983 Fourteenth Amendment—Substantive Due Process*

In Count Two of his amended complaint, T.S. claims that Mr. Bynum administered excessive corporal punishment in violation of his substantive due process rights under the Fourteenth Amendment. (Doc. 24 at 6–8).

"Officials acting under the color of state law violate the substantive component of the Due Process Clause only when their conduct can properly be characterized as arbitrary, or conscience shocking, in a constitutional sense."

*Peterson v. Baker*, 504 F.3d 1331, 1336 (11th Cir. 2007) (quotation marks omitted). "[T]he due process guarantee does not entail a body of constitutional law imposing liability whenever someone cloaked with state authority causes harm." *Id.* (quotation marks omitted). Therefore, the Supreme Court and the Eleventh Circuit "have both said repeatedly that the Fourteenth Amendment is not a 'font of tort law' that can be used, through section 1983, to convert state tort claims into federal causes of action." *Neal ex rel. Neal v. Fulton Cty. Bd. of Educ.*, 229 F.3d 1069, 1074 (11th Cir. 2000).

Consistent with this principle, excessive corporal punishment "may be actionable under the Due Process Clause when it is tantamount to arbitrary, egregious, and conscience-shocking behavior." *Id.* at 1075. To establish that excessive corporal punishment rises to the level of arbitrary, egregious, and conscious-shocking behavior, a plaintiff must demonstrate that "(1) a school official intentionally used an amount of force that was obviously excessive under the circumstances, and (2) the force used presented a reasonably foreseeable risk of serious bodily injury." *Id.* "Excessive corporal punishment claims have an objective and a subjective component, both of which must be met before a school official may be subject to liability." *Neal*, 229 F.3d at 1075 n.3; *T.W. ex rel. Wilson v. Sch. Bd. of Seminole Cty., Fla.*, 610 F.3d 588, 600 (11th Cir. 2010) ("The evidence must support a reasonable inference that the punishment is 'obviously excessive' as an

objective matter" and that the school administrator "subjectively intend[ed] to use that obviously excessive amount of force in circumstances where it was foreseeable that serious bodily injury could result.") (quotation marks omitted; alteration in original).

With respect to the objective component, the court must determine "whether the amount of force used is obviously excessive by considering the totality of the circumstances." *Peterson*, 504 F.3d at 1337. Specifically, the court examines "(1) the need for the application of corporal punishment, (2) the relationship between the need and amount of punishment administered, and (3) the extent of the injury inflicted." *Id.* (quotation marks omitted).

The first factor requires the court to consider the need for application of force. T.S. submits that Mr. Bynum paddled him "for writing the name of the President of the United States on a classroom whiteboard" and that the paddling was "shocking" and "egregious" because T.S. "was lawfully exercising his rights under the First Amendment and was then subjected to unlawful corporal punishment for exercising said rights." (Doc. 42 at 10–11; Doc. 50 at 11–12). T.S.'s argument is not persuasive. The court's inquiry at this stage is not whether the corporal punishment was administered for the lawful exercise of constitutional rights or whether force was appropriate as a matter of policy. Rather the court must "determine whether the

force is capable of being construed as an attempt to serve pedagogical objectives." *Wilson*, 610 F.3d at 600 (quotations omitted).

Mr. Bynum corporally punished T.S. consistent with Board policy. Mr. Bynum classified T.S.'s infraction as a Minor Offense – Class I, Disruption of School. (Doc. 38-9 at 3). According to the Board's Code of Conduct and Attendance, "disruption of school" is "[a]ny conduct or behavior which is disruptive to the orderly educational process in the classroom, school related programs or to any other students," including "interrupting class functions" and "provoking other students." (Doc. 38-6 at 3). The Code of Conduct and Attendance states that "[s]pecial circumstances may warrant" corporal punishment for Class I violations. (Doc. 38-6 at 4; *see* doc. 38-6 at 5). The evidence demonstrates that Mr. Bynum offered T.S. the option of in-school suspension or paddling and ultimately concluded that paddling was appropriate for T.S.'s misconduct because T.S. had been issued in-school suspension for another infraction earlier in the school year, and Mr. Bynum was not sure another in-school suspension would be effective. (Doc. 38-5 at 57). Therefore, the court finds that Mr. Bynum was acting with an appropriate disciplinary purpose when he paddled T.S.

The second factor requires the court to consider the relationship between the need for force and the amount of force used. Based on T.S.'s own characterization of the licks, the force was not "too bad." (Doc. 38-1 at 73–74). And the record is

undisputed that the amount of force Mr. Bynum used was consistent with paddlings he previously administered.  (Doc. 38-7 at 5; Doc. 38-11 at 3).  Thus, the court finds that no reasonable juror could conclude that Mr. Bynum administered more force than necessary for T.S.'s behavior.

The final factor that the court must consider is the extent of T.S.'s injuries.  "Though the 'extent and nature of the injury' is only one factor in [the court's] analysis, it is an important factor."  *Wilson*, 610 F.3d at 601.  The record indicates that T.S. might have experienced some discomfort, but his injuries, if any, were minor.  *Neal*, 229 F.3d at 1076 ("We recognize that any time a student is slapped or paddled, whether pursuant to or apart from a school policy, the student may suffer some pain or injury.  But the kind of minor injury suffered by a student during the administration of traditional corporal punishment will rarely, if ever, be the kind of injury that would support a federal due process claim for excessive corporal punishment. . . .").

T.S. testified that the first lick "hurt a good bit."  (Doc. 38-1 at 65).  But within minutes of the paddling, T.S. returned to Ms. Foy's classroom, acting normally, and was in no discomfort.  (Doc. 38-1 at 66; Doc. 38-8 at 4).  T.S. had no bruises or other noticeable sign of injury, and he did not need medical treatment or counseling.  (Doc. 38-1 at 69–70, 76, 84; Doc. 38-3 at 39–40, 60).  When his mother checked him out

of school, T.S. was not in pain, and he testified that there was no reason he could not have stayed at school. (Doc. 38-1 at 69).

Considering the totality of the circumstances, particularly the absence of meaningful injury, the court concludes that as a matter law, Mr. Bynum's administration of corporal punishment falls short of conduct that the Eleventh Circuit has recognized as obviously excessive. *Wilson*, 610 F.3d at 603 (no substantive due process violation where a teacher sat on a student to restrain him, forced him to the floor in an uncomfortable position, shoved him into a wall, and pinned his arms behind his back, all causing some bruising, transient pain, and psychological trauma); *Peterson*, 504 F.3d at 1338 (no substantive due process violation where a teacher choked a student, causing him to temporarily lose his breathe, suffer blue and red bruises, and a scratch on his neck); *but see Kirkland ex rel. Jones v. Greene Cty. Bd. of Educ.*, 347 F.3d 903, 904 (11th Cir. 2003) (affirming denial of summary judgment where a principal repeatedly struck a non-resisting student with a metal cane in the head, ribs, and back, resulting in a large knot on the student's head and migraine headaches); *Neal*, 229 F.3d at 1076 (vacating summary judgment in favor of defendant where a coach struck a student in the eye with a weight lock, knocking the eye out of its socket and causing permanent injuries). Because Mr. Bynum's use of force was not obviously excessive, the court does not evaluate Mr. Bynum's subjective intent. *See Wilson*, 610 F.3d at 602–03 (explaining

that the intent of the school official is irrelevant if the force used was not excessive as a matter of law).

 "[T]he Due Process Clause imposes liability only in extraordinary circumstances." *Id.* at 602 (quotation marks omitted). Although the court might not have chosen to corporally punish T.S., Mr. Bynum's administration of two licks with a paddle was not "so brutal, demeaning and harmful as literally to shock the conscience of the court." *Id.* (quotation marks omitted).

Because Mr. Bynum's paddling of T.S. does not shock the conscience, Mr. Bynum is entitled to qualified immunity on T.S.'s § 1983 due process claim. Accordingly, the court **WILL ENTER** summary judgment in favor of Mr. Bynum on this claim.

2.      § 1983 Claims Against the Board

In Counts One and Two, T.S. claims that the Board violated his free speech and due process rights under the First and Fourteenth Amendments based on the same conduct that forms that basis of his claims against the individual defendants. (Doc. 24 at 4–8).

"A plaintiff seeking to impose liability on a municipality (school district) under section 1983 must identify a municipal 'policy' or 'custom' that caused a deprivation of federal rights." *Davis ex rel. Doe v. Dekalb Cty. Sch. Dist.*, 233 F.3d 1367, 1375 (11th Cir. 2000). "[A]n inquiry into a governmental entity's custom or

policy is relevant only when a constitutional deprivation has occurred." *Rooney v. Watson*, 101 F.3d 1378, 1381 (11th Cir. 1996); *McDowell v. Brown*, 392 F.3d 1283, 1289 (11th Cir. 2004) ("[T]o impose § 1983 liability on a municipality, a plaintiff must show . . . that his constitutional rights were violated. . . ."). Because the court has concluded that neither Ms. Foy nor Mr. Bynum violated T.S.'s constitutional rights, T.S.'s § 1983 claims against the Board fail as a matter of law. *See Wilson*, 610 F.3d at 603 (affirming district court's grant of summary judgment to school board on § 1983 claim because the individual defendant did not violate the plaintiff's constitutional rights).

Accordingly, the court **WILL ENTER** summary judgment in favor of the Board on T.S.'s § 1983 free speech and due process claims.

## III.   CONCLUSION

For the reasons explained above, the court **GRANTS** Defendants' motions for summary judgment on T.S.'s § 1983 claims and **ENTERS JUDGMENT** in favor Defendants on those claims. The court **DISMISSES** T.S.'s § 1983 claims **WITH PREJUDICE**.

The only remaining claims are T.S.'s state law assault, battery, and intentional infliction of emotional distress claims against Mr. Bynum. In his amended complaint, T.S. alleges that the court has supplemental jurisdiction over his state law claims pursuant to 28 U.S.C § 1367. (Doc. 24 at ¶ 2). The amended complaint does

not allege T.S.'s citizenship or that of Mr. Bynum, and the amended complaint does not allege or establish that the amount in controversy exceeds $75,000, sufficient to invoke the court's diversity jurisdiction. (*See generally* Doc. 24).

In the absence of an independent basis for jurisdiction over T.S.'s state law claims against Mr. Bynum, the court will dismiss the claims without prejudice pursuant to 28 U.S.C. § 1367(c). **Within 7 days of entry of this order**, T.S. shall show cause why the court has original jurisdiction over his state law claims.

**DONE** and **ORDERED** this August 6, 2019.

_____
**ANNEMARIE CARNEY AXON**
UNITED STATES DISTRICT JUDGE